THE TEXAS & PACIFIC RAILWAY COMPANY V.
PAUL HAGENLOH

No. A-3353. Decided March 5, 1952.
Rehearing overruled April 9, 1952.
(247 S. W., 2d Series, 236.)

192

*D. L. Case,* of Dallas, *Burges Scott, Rasberry & Hulse and J. F. Hulse,* of El Paso, for Petitioner.

It was error for the Court of Civil Appeals to hold that there was evidence in this case raising an issue of whether Houghland, as special agent for the defendant, was acting in the furtherance of his duties for defendant (petitioner in Supreme Court) at the time he struck plaintiff. Houston Transit Co. v. Felder, 146 Texas 428,208 S.W. 2d 880; Missouri Pac. Ry.Co.v. Porter, 73 Texas 304, 11 S.W. 324; Texas & Pac. Ry. Co. v. Brown, 142 Texas 385, 181 S.W. 2d 68

*Hildebrand, Bills & McLeod* and *John Paul Jones,* all of Oakland, Calif., and *Carroll W. Smith,* of El Paso, Texas, for respondents.

MR. JUSTICE SMEDLEY delivered the opinion of the Court.

Respondent, Paul Hagenloh, filed this suit against petitioner, The Texas & Pacific Railway Company, for damage because of injuries inflicted upon him by a blow struck by C. B. Houghland. Both respondent and Houghland were employees of petitioner, respondent being a brakeman and baggageman and Houghland being a special agent.

The principal question in the case is whether Houghland, in striking respondent, was acting within the scope of his employment. The jury in answer to special issues found that when

Houghland accosted respondent he did so in pursuance of one or more of his duties as agent of petitioner, the railway company; that he struck respondent without cause or provocation; that respondent did not provoke or invite the blows, and that at the time of the altercation Houghland was not off duty. Judgment was rendered in respondent's favor against petitioner for $7400.00. Petitioner filed a motion for an instructed verdict, and after verdict a motion for judgment non obstante veredicto. The Court of Civil Appeals, after reviewing the evidence fully, reached the conclusion that a jury issue was raised and affirmed the trial court's judgment. 241 S. W. 2d 669.

**1** The first point of error in the application for the writ is that the Court of Civil Appeals erred in holding that there is evidence raising an issue whether C. B. Houghland was acting in the furtherance of his duties for petitioner at the time he struck respondent. In considering and deciding the question presented by the point, we follow the familiar rule, referred to in the opinion of the Court of Civil Appeals, that credit is to be given to all evidence favorable to respondent, every legitimate conclusion favorable to him indulged, and all adverse evidence disregarded. Wininger v. Fort Worth & D. C. Ry. Co., 105 Texas 56, 58, 143 S. W. 1150

Both respondent and Houghland testified at length about their acts and conversations prior to the time of the last encounter and about what was said and done in that encounter. There are no important conflicts except in their testimony as to what was said just before Houghland struck respondent. Houghland ceased to be an employee of petitioner more than two years before this case was tried. He was called as a witness by respondent, who insists that he was an adverse witness, and that the jury could disregard any part of his testimony even though uncontradicted. The Court of Civil Appeals sustained that contention, saying that it seemed clear that Houghland was a hostile and adverse witness, apparently basing its conclusion on the fact that Houghland was charged with making and did make an assault on respondent. In view of the disposition that in our opinion can correctly be made of the case without reference to Houghland's testimony, it is unnecessary either to approve or disapprove the ruling of the Court of Civil Appeals that Houghland was an adverse witness. It may not be inappropriate to say here, without discussing Houghland's testimony in detail, that if believed it would show that at the time he accosted respondent and struck him he was not on duty for petitioner, being

then "off" for two days; that he had prior to that time closed the investigation of the loss of the jewelry out of which the ill feeling between him and respondent arose; that 'he accosted respondent only to discuss a personal grievance which he understood respondent had against him; and that he struck respondent in resentment of a grievous personal insult spoken by respondent.

Respondent Hagenloh resided in El Paso. He worked as a brakeman on petitioner's freight trains between El Paso and Toyah, and at times he worked as a baggage man on petitioner's passenger trains between El Paso and Big Spring. Houghland resided in Toyah and worked for petitioner as a special agent, his territory extending from El Paso to Big Spring and south out of Pecos to Balmorhea, and from Monahans north to Lovington, New Mexico. Respondent's briefs indicate that he relies upon Houghland's testimony as to the nature and extent of his duties and authority, and Houghland's testimony seems to be the only direct evidence of the same. He testified that it was his duty to protect all property, to investigate trespasses, personal injuries at railroad crossings, claims for damages to stock, and other claims for damages, and that when claims were made for missing baggage or other property it was his duty to take care of the claims and to undertake to find the missing property, and that in the performance of those duties he "was given pretty much of a free hand within reason", but had to go by the rules.

The following statement of what occurred between respondent and Houghland is taken from respondent's testimony. Respondent first became acquainted with Houghland about Christmas of 1946, when Houghland entered the baggage car and without introducing himself looked at the baggage here and there and looked through the "pigeon holes" against the wall where company mail, little packages and registered mail were carried. In January, 1947, Houghland continued the inspections and also went through respondent's brief case which contained company material such as forms, envelopes, clips and pencils. The inspections continued until the middle of June, 1947. At some time during that period, the date not definitely shown, Houghland went through respondent's little suitcase or overnight bag in which he kept extra clothes. Houghland told him at that time that something had been missing when respondent's car came into El Paso, and asked him whether he knew anything about the missing articles. Respondent answered that he did not.

In March, 1947, the owner of three pieces of baggage, picked up by respondent at Pecos and checked for California, changed her mind and requested that the baggage be taken off at El Paso. Respondent placed the baggage at the door with other El Paso baggage and left the car for his home, being relieved of his duty as soon as the train stopped at El Paso. About a week later at Toyah Houghland told respondent that some jewelry was missing from that baggage. He did not accuse respondent of taking the jewelry, but asked him whether he knew anything about it, since he was the only one who had handled the baggage. Respondent told Houghland that he knew nothing about it, and he testified that he did not take anything that belonged to the woman or to the railway company. After that incident Houghland contined to enter respondent's car and inspect his baggage as well as the company's baggage. Respondent complained to Mr. Bishop, superintendent of special agents, telling him about Houghland's investigations and statements as to the missing jewelry.

Two or three weeks after the incident of the missing jewelry Houghland and two other men, who represented themselves as F.B.I. agents, called at respondent's home in the early evening. Houghland said that they came in connection with "that baggage deal", and that they would like to go through respondent's house. Although they had no search warrant, respondent invited them to come into the house. They did not enter the house, but asked him for his baggage reports of about the time when the property was missing. He gave them the reports except one sheet, which he had mailed to his "boss"or the "timekeeper".

There were other searches by Houghland and sometime in June respondent made a report to Mr. French, assistant superintendent of the railway company, telling him of the searches and of the visit made by Houghland and the F.B.I. agents to his home, and requesting French to have an investigation made by the railway company and the employees' brotherhood. French promised to "check into it" and let him know. Respondent did not hear from French.

Later Houghland entered respondent's baggage car when the train stopped at Monahans and again went through the company's mail in the "pigeon holes" and respondent's brief case. Houghland then started to look into respondent's "little personal suitcase" and had laid his hands on it, when respondent turned and grabbed it and told Houghland that he was getting tired of his looking through his personal baggage and that he

could not look through it. Thereupon Houghland stepped to the car door and asked Mr. Bishop, his immediate superior who was standing outside of the door, to come into the car and told him that he was trying to go through respondent's suitcase and respondent would not let him inspect it. Bishop thereupon told Houghland "if you have anything against Hagenloh, find out about it and settle with him after he gets off of the train, after you are through working." Houghland pointed his finger at respondent and said: "I am going to find out; that is exactly what I am going to do." When respondent's train arrived at Big Sprping he "was pretty much excited" and reported the Monahans incident to Mr. Brannon, division superintendent, and begged him to have an investigation made. He got no report from Brannon. Respondent testified that he was tired of being aggravated, that he resented the fact that Houghland went through his personal belongings, and that he became angry when Houghland at Monahans looked into the "pigeon holes," went through the brief case, and finally went into his own suitcase.

Several days after the Monahans incident, from two to five days according to respondent's testimony, respondent completed a "run" as brakeman on a freight train from El Paso to Toyah, arriving at Toyah at 8:30 P.M. He left his brief case and lantern in the yard office and went across the street to a cafe. After eating he left the cafe and started to go back across the street and across the tracks to the depot for his bag, intending then to go to his rooming house. When he was walking up the street or road after leaving the cafe and had reached a point about forty feet north of the railroad tracks, he heard someone call him. He stopped, and Houghland came to him and said: "I want to talk to you about the baggage incident." Respondent said: "I don't think that this is the place to talk about it. I would like to have an investigation, which I have asked for, and probably will get." Then in the words of respondent's testimony the following: "He said 'I don't need an investigation. I have made up my mind to find out right now, right here, right now.' He said 'you are a thief and you belong in the penitentiary.' And I said—I don't remember just the exact words, I said 'well, how come?' And he said 'Judge Schmidt told me.' And I said 'that is a lie.' With that, as I was talking to him, had started around and trying to walk in the same direction I had originally started, turned away from him and when I said 'that is a lie,' he hauled out and hit me with his right hand."

The blow was struck on the back of respondent's head, on a

part of his ear. It staggered him but did not knock him down. He ran toward the depot pursued by Houghland, who struck him again and knocked him down as he entered the door of the depot.

J. R. Cobb, an employee of petitioner, was called as a witness by respondent. He testified that while engaged in making up a train as a brakeman he saw the two men running and followed them to the door of the depot, where he heard Houghland "cussing" respondent and saying to him "I'll teach you to call me a liar."

**2** After careful examination of the record and the applicable authorities, and bearing in mind the rule stated at the beginning of this opinion for testing the evidence in the consideration of a motion for peremptory instruction, we are of the opinion that it is not reasonably to be inferred from Houghland's words and conduct on the night of the assault as described in respondent's testimony or from that testimony and any other evidence in the record, that Houghland in accosting respondent and assaulting him was acting within the scope of his employment or in pursuance of his duties or in the furtherance of petitioner's business.

**3** The case is one of assault by an employee, and the ultimate question is whether the employer should be held responsible for the consequences of the assault. It is not ordinarily within the scope of a servant's authority to commit an assault on a third person. 57 C.J.S., p. 341, Sec. 575. And the cases in which liability has been imposed upon the master for assault by his servant are comparatively few. Usually assault is the expression of personal animosity and is not for the purpose of carrying out the master's business.

The nature of the employment may be such as necessarily to involve at times the use of force, as where the employee's duty is to guard the employer's property and to protect it from trespassers, so that the act of using force may be in furtherance of the employer's business, making him liable even when greater force is used than is necessary. International & G.N.Ry.Co. v. Anderson, 82 Texas 516, 17 S. W. 1039, cited in the opinion of the Court of Civil Appeals, sets out the rules applicable when that is the nature of the employment. A brakeman on the railway company's freight train, in ejecting a trespasser from the train struck him and caused him to fall under the wheels. The court,

stating the law of the case, said that the master may be liable for the act of the servant even though the master has expressly forbidden the particular act, and added: "But the act must be done within the scope of the general authority of the servant in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed." It was held that the trial court's charge was erroneous because its effect was to place the burden upon the railway company to prove that the brakeman who ejected the trespasser was not acting within the scope of his employment, whereas the burden was on the plaintiff to prove the facts which would entitle him to recover, including proof that the servant who did the wrong was acting within the scope of his employment. The plain implication of the opinion is that the railway company would have been liable had such proof been made by the plaintiff, that is, if the plaintiff had proved that the brakeman had authority to eject trespassers.

In this case the evidence is that Houghland was a special agent of petitioner, whose duties were to protect petitioner's property, investigate trespassers, claims and damages, and for missing baggage or other property and undertake to find missing property. In his acts in relation to respondent Houghland was not engaged in protecting the railway company's property from trespass or otherwise. He was investigating for the purpose of finding property missing from baggage. His duties in that respect were not of such nature as to involve the use of force, and there is no evidence in the record tending to prove that he was authorized to use force in the performance of those duties. And so it seems that in this respect respondent failed to prove a fact essential to recovery by him against petitioner.

However, when we look to all of the evidence bearing upon Houghland's conduct in relation to respondent, what was done and what was said, we believe that the only reasonable conclusion is that in accosting and striking respondent Houghland was not acting in furtherance of petitioner's business, but was carrying on an enmity that had developed between him and respondent to gratify personal animosity, and that his acts were not for his employer, but were personal to him.

Over a long period Houghland had been making from time to time inspections of respondent's baggage car, searching for lost baggage or valuables from baggage. The inspections were so thorough and frequent as to annoy respondent and cause him

to make several complaints to respersentatives of petitioner and ask for an investigation. It very clearly appears from Houghland's acts and words as described in respondent's testimony that after the incident of the missing jewelry Houghland believed that respondent was responsible for the loss of the jewelry. He did not accuse him of having stolen it, but asked him what he knew about it, and told him he was the only one who had handled the baggage. He continued to search respondent's baggage car, and even opened and looked into his personal baggage and visited respondent's home with F.B.I. agents and asked permission to search the house. On the occasion of the incident at Monahans from two to five days before the assault both Houghland and respondent became angry. Houghland laid his hands on respondent's personal suitcase and respondent grabbed the suitcase. Respondent's testimony shows that a personal encounter probably would have occurred then but for the presence of Bishop, who was Houghland's superior.

Respondent and Houghland met again two to five days later at Toyah, where the assault was made. Respondent had completed his "run" from El Paso. His day's work was done, and at about 9 o'clock P.M. he was on his way from a restaurant, where he had eaten dinner, to the depot to pick up his brief case and then go to his rooming house. The evidence, except Houghland's testimony, does not show what Houghland was doing immediately before the encounter. The time was after normal working hours. When Houghland accosted and struck respondent they were not on petitioner's property, but in the street or road. It may seem from Houghland's first words that he was pursuing the investigation of the missing jewelry. He said that he wanted to talk about the baggage incident, and that he had made up his mind to find out then and there, but those words were immediately followed by "You are a thief and belong in the penitentiary," showing that his intention was to abuse and revile respondent rather than to obtain information from him. The encounter was, or immediately became, personal, and the words were insulting and spoken in anger. The words and the assault that followed were the expression of contempt and animosity, and they were not in pursuance of the employer's business. It is true that the assault may be traced back to Houghland's performance of his duty to investigate the loss of the jewelry, but that investigation was the remote cause of the personal encounter, and the encounter and assault were not so closely related to the investigation in time or in place as to be a part of it.

The material facts in this case are in substance very nearly

the same as those of several decisions of the Courts of Civil Appeals in which judgments of the trial courts against employers on account of assault by employees were reversed and remanded, or judgments for employers affirmed, because the evidence conclusively showed that the employee in making the assault was actuated by personal animosity and that there was no close relationship between the assault and the performance of the duties of the employment. See: Home Telephone & Electric Co. v. Branton, 7 S. W. 2d 627; National Life & Accident Co. v. Ringo, 137 S. W. 2d 828, application for writ of error refused; AB.C. Stores v. Brown, 105 S. W 2d 725; Greathouse v Texas Public Utilities Corp., 217 S. W. 2d 190; Hidalgo v. Gulf, C. & S.F. Ry. Co, 60 Texas Civ App. 433, 128 S. W. 683, application for writ of error refused; Lytle v. Crescent News & Hotel Co, 27 Texas Civ. App. 530, 66 S. W. 240.

Houston Transit Co. v. Felder, 146 Texas 428, 208 S. W. 2d 880, is cited by the Court of Civil Appeals and relied upon by respondent for affirmance of the judgment in his favor. An automobile driven by Felder ran into the rear of a transit company's bus. Goodson, the operator of the bus, left it, went to Felder's automobile and struck Felder in the face with a money-changing Box. Goodson testified that he left his bus and went to get Felder's name and automobile license number as it was his duty to do, that Felder refused to give his name, started reviling him, and laid his hand on him, and that he then struck Felder. Felder testified that Goodson came around to the rear of the bus, looked at the bumpers, shouted something that he did not understand, and hit him before he had said a word. The jury found that Goodson was acting within the scope of his employment when he committed the assault, but the trial court rendered judgment for the transit company notwithstanding the verdict. The Court of Civil Appeals reversed and rendered judgment for Felder on the verdict, and the Supreme Court affirmed that judgment. The Supreme Court's judgment and opinion are based upon the evidence that Goodson, in keeping with his duties, went immediately after the collision to Felder's automobile to get information, and that while he was thus about his master's business and before he had finished the mission, he committed the assault. The opinion is expressed that the assault was so closely connected with the performance of Goodson's duties as to prevent the conclusion as a matter of law that when he struck Felder he had ceased to act for the company and had begun to act for himself. And on that basis the Court distinguished the case from the Branton case and the

Ringo case cited above. In the instant case the assault, as has been shown, was not thus closely connected with the service that Houghland had been performing for petitioner.

4  The rule of Galveston H. & S.A.Ry.Co. v. Currie, 100 Texas 136, 96 S.W. 1073, 10 LRA (NS) 367, also requires the reversal of the judgments of the trial court and the Court of Civil Appeals. The rule is that "when the servant turns aside, for however short a time, from the prosecution of the master's work to engage in an affair wholly his own, he ceases to act for the master and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone." 100 Texas 136, 142, 96 S.W. 1073, 1074. If it be assumed (which in our opinion is not a reasonable assumption) that when Houghland first accosted respondent he was continuing his search for the missing jewelry and was pursuing petitioner's business, his act in striking respondent after respondent said "That is a lie" was a clear departure for the time from the service of petitioner to engage in an act of violence in his own behalf and in resentment of a personal insult. It is not reasonably to be inferred that the blow was struck as a part of the search for the missing jewelry. Houghland had told respondent that he was a thief and should be in the penitentiary, and added that Judge Schmidt told him. Respondent said "That is a lie," and Houghland immediately struck respondent, pursued him, and struck him again. If it be assumed that at the beginning of the encounter Houghland was in the course of the master's service, he stepped aside from that service in anger and in resentment, not in play as in the Currie case. By the same principle, however, his act when he stepped aside and struck respondent was his act and not that of his employer.

That Houghland struck respondent because respondent called him a liar was evidence also by the testimony of J.R. Cobb, a witness called by respondent. He was near by at the time of the assault, saw the two men running toward the depot, followed them to the door of the depot and heard Houghland say to respondent "I'll teach you to call me a liar." Cobb was an employee of petitioner, but he was called by respondent as a witness, and his testimony was not contradicted. Respondent did not take the position that Cobb should be considered an adverse witness under Rule 182.

The case has been fully developed. Our opinion is that the judgments of the District Court and the Court of Civil Appeals

should be reversed and that judgment should be rendered here that respondent take nothing by his suit. It is so ordered.

Opinion delivered March 5, 1952.

MR. JUSTICE SMITH, joined by Justices Sharp and Calvert, dissenting.

I most respectfully dissent from the opinion expressed by the majority in this case.

Obviously, the vital and ultimate answer that determines the merits of this case is whether or not Houghland was acting within the scope of his authority on the occasion when Hagenloh was injured. The majority opinion, while purporting to have followed the rule set out in Wininger v. Fort Worth & D. C. Ry. Co., 105 Texas 56, 143 S.W. 1150, states: "we are of the opinion that it is not reasonably to be inferred that Houghland's words and conduct on the night of the assault as described in respondent's testimony or from that testimony and any other evidence in the record, that Houghland in accosting respondent and assaulting him was acting within the scope of his employment or in pursuance of his duties or in the furtherance of petitioner's business." With this conclusion we cannot agree.

There can be but little disagreement between us over the rules by which we are to test whether the action of Houghland was within the scope of his employment. However, we disagree with the statement in the majority opinion that the rule quoted by the majority from International & G. N. R. Co. v. Anderson, 82 Texas 516, 17 S.W. 1039, applied only when the employee is possessed of the authority to use some degree of force. To the contrary, we think the quoted language announces the essential tests for determining the scope of general authority of any employee. His act, to be within the scope of his general authority, must be done (1) in furtherance of the master's business, and (2) for the accomplishment of an object for which the servant is employed. In Magnolia Petroleum Co. v. Guffey, 129 Texas 293, 102 S.W. 2d 408, these two elements were described as follows: "The final and conclusive test in all cases without any distinction as to negligent torts and willful torts is whether or not the act or omission of the agent constituting the tort, although itself not authorized, and even if in violation of instructions, was an act done or omitted in pursuance of the principal's business, and within that particular part of such business, if less than all, committed to the agent."

Our difference with the majority opinion concerns a limitation on the above rule which we do not believe is a proper limitation. We understand the majority opinion to say, in effect, that an employer can never be liable for an assault and battery committed by his employee unless the employee acts pursuant to an authority, general or limited, which permits the use of physical force to some degree. Consequently, Houghland could not, in the majority's view, have been acting within his general investigative authority because the majority found "no evidence" that he was authorized to use physical force against persons in obtaining information for the company. Before discussing the law point, we will state that in our view there is a serious question presented by the record as to whether this employer, through its agents Bishop, Brannon and French, could have been found by the jury to have known of and acquiesced in Houghland's threatened use of force to get information so that Houghland would be held to have had apparent authority to so act. See Restatement, Agency, Sec. 26, Comment d., p. 75. The record indicates that Hagenloh had complained to each of them of Houghland's methods. The record shows that after the incident at Monahans, Bishop, in the presence of Hagenloh, said to Houghland, "If you have anything against Hagenloh, find out about it and settle with him after he gets off of the train, after you are through working." Following this, Houghland pointed his finger at Hagenloh and said, "I am going to find out; that is exactly what I am going to do." Admittedly this evidence will bear many different interpretations, but, in our view, it may well be sufficient, under Rule 279, to have supported a finding thereon by the jury that there was, on the employer's part, at least an acquiescense in a course of conduct by Houghland calculated to force information from Hagenloh,, if it could not be interpreted as an express authorization to so act.

But we do not think it necessary to the employer's liability here that it should be found that Houghland had authority to use physical force to get information. As we read the cases, such a finding is not a prerequisite to a conclusion that an assault and battery were within the scope of employment of the assaulting employee. All that is required is (1) that the act was in furtherance of the master's business, and (2) that the act was done for the accomplishment of an object for which the particular servant was employed. The Anderson case, supra, illustrates the separate functions of both parts of the rule. It would be in furtherance of the master's business for a brakeman, or any other specialized employee, to eject trespassers.

Yet ejection of trespassers does not accomplish the object for which a brakeman is employed. Therefore, the plaintiff in that case had not met his burden of showing that the brakeman was within his general scope of authority and it was error for the trial court to imply authority on the brakeman's part and to shift the burden of proving otherwise to the employer. The most impressive negation of the idea that there must be some authority to use force before an assault and battery can be within the scope of authority is Houston Transit Co. v. Felder, 146 Texas 428, 208 S.W. 2d 880. There is no indication whatever in that case that the bus driver was authorized to use any amount of force in obtaining information about the collision. Nevertheless this court affirmed the opinion of the Court of Civil Appeals which had reversed a judgment non obstante for defendant and had rendered judgment for plaintiff on the jury verdict. The rule of law applicable is stated in Corpus Juris as follows:

"If the act complained of was within the scope of the servant's authority, the master will be liable, although it constituted an abuse or excess of the authority conferred. The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury on a third person." 39 C. J. p. 1285, Sec. 1476.

As said by Justice Alexander in Central Motor Co. v. Gallo, Tex. Civ. App., 94 S.W. 2d 821, 822:

"The real test of the master's liability is, not whether the servant's employment contemplated the use of force or whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do."

See also Magnolia Petroleum Co. v. Guffey, supra.

The second reason given by the majority for its conclusion that no evidence supported the jury finding that Houghland was within the scope of his authority is the conclusion reached by the majority that the evidence shows as a matter of law that

Houghland struck Hagenloh out of personal animosity. We are in complete accord with the idea that a servant who commits an assault and battery solely in response to insulting words, or other purely personal reasons, does not act within the scope of his authority. Such action would not pass either of the two tests for scope of authority which we have spoken of. Our difference with the majority springs from our conviction that they have refused to discard "all adverse evidence," have refused to give credit "to all evidence favorable to plaintiff," and have refused to indulge "every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved." Wininger v. Fort Worth & D. C. Ry. Co., supra. There is ample evidence in this record that the scope of Houghland's authority permitted him a wide choice of methods in collecting information. We think, within the limits of the review of the evidence to which we are here committed, that "a jury might have found" and reasonably could have found, in answering the issue that Houghland acted to recover lost jewelry in furtherance of his master's business, that his act was done for the accomplishment of an object for which Houghland was employed; namely, to get information. The witness, Houghland, testified that it was his duty to investigate claims for missing baggage and other property, and respondent, Hagenloh, also testified, without objection, that such was one of the duties of Mr. Houghland.

Shortly after Christmas, 1946, the claim was filed for the missing "Pecos jewelry." Mr. Houghland began his investigation and continued working on the case until July 27, 1947. Mr. Houghland worked under contract with the Railroad as a special officer on a monthly salary basis. The missing jewelry was alleged to have been taken from some baggage being transported in a baggage car under the exclusive control of Mr. Hagenloh. The petitioner lays great stress on a claim that Mr. Houghland did not, at any time during the investigation, accuse Hagenloh of stealing the jewelry, and the majority opinion emphasizes this. We think the testimony would lead a jury to believe that Mr. Houghland did accuse Mr. Hagenloh of stealing the jewelry and that he continued to think so right up to the moment he accosted respondent and made the attack on the night of July 27, 1947. Hagenloh testified on cross-examination:

Q. "Did Mr. Houghland ever accuse you of stealing anything?"

A. "He had said there were some things missing out of the baggage car and that I had handled and I was the only man who

did handle that very specific piece of baggage from Pecos to El Paso from which the jewelry was missing."

Hagenloh further testified that Houghland told him that it was missing and he was the only man that had handled it, and he wanted to know what became of it. He also testified that when Mr. Houghland came to his house with two F. B. I. officers some three weeks later, Mr. Houghland was still searching for the missing jewelry, and again repeated that it was missing from his baggage car, and that "I was the only one that did handle it." Mr Hagenloh at all times denied any knowledge of the missing jewelry, and went to three officials, Bishop, Brannon and French, and demanded an investigation of the case. He explained the nature of the case and the activities of Mr. Houghland. Under the contract between the Railroad and the Railroad Brotherhood of which Hagenloh was a member, he, Hagenloh, had the right, under such circumstances, to demand an investigation, either by making such demand through the Brotherhood or in person. He chose the latter course. All of these officials in authority knew the facts, yet failed to grant his request. They knew Mr. Houghland was investigating the theft of the jewelry and that was the only business Mr. Houghland had with Hagenloh. Mr. Houghland claims that he merely wanted to straighten Mr. Hagenloh out as to his (Houghland's) duties. He says that when he went into the baggage car several days before July 27, 1947, he had no purpose other than to see if Mr. Bishop had any mail in the car, but while in there Mr. Hagenloh says that Houghland began his usual routine of searching the car, which he had a right to do; that when Mr. Houghland started to search his personal bag on that date, he had gotten tired of such conduct, and refused to allow the search; that he had made repeated efforts to have a complete investigation, as provided for in his contract with the Railroad, and although the officials would make promises to do so, they failed. The petitioner, knowing that Mr. Bishop, an official with authority, was present when this incident occurred failed to call Mr. Bishop as a witness. It seems to me that if Mr. Bishop had sent Mr. Houghland into the car solely for the purpose of getting mail, he could have said so. Hagenloh testified that Mr. Houghland told him on one occasion prior to July 27, 1947, that he (Houghland) was *continuing to search his belongings because he had not cleared up the Pecos jewelry deal and it was his job to do it.* When Mr. Hagenloh refused Mr. Houghland permission to search his "personal belongings" on the date Mr. Bishop was present, Bishop was called into the car and told by Mr. Houghland what had

happened. Mr. Bishop knew that Mr. Houghland was then searching for the missing jewelry, and knowing that he had not granted Hagenloh's request for a thorough investigation, as provided under the contract heretofore mentioned, continued to approve Mr. Houghland's method of procedure, and while standing in the car said to Mr. Houghland *"if you have anything against Hagenloh, find out about it and settle with him after he gets off of the train, after you are through working."* (Emphasis added.) Houghland then pointed his finger at Hagenloh and said "I am going to find out; that is exactly what I am going to do."

Now what was Mr. Bishop referring to when he made this statement? Was he talking about his personal mail, or was he directing Mr. Houghland to continue his investigation of the missing jewelry and settle with Mr. Hagenloh? The jury reached the conclusion, supported by a preponderance of evidence, that at the time Houghland accosted Hagenloh on July 27, 1947, he did so in pursuance of one or more of his duties as agent of the defendant. The jury further found that at the time Houghland struck plaintiff, he, (Houghland) was on duty for the company. In other words, the jury believed that Houghland was still searching for the missing jewelry when he accosted Hagenloh and said: "I want to talk to you about the baggage incident." The jury believed Hagenloh's statement as to the conversation which immediately followed the above statement: "I don't think that this is the place to talk about it. I would like to have an investigation, which I have asked for, and probably will get." To which Houghland replied: "I don't need an investigation. I have made up my mind to find out right now, right here, right now. You are a thief and you belong in the penitentiary." Hagenloh said, "Well, how come." And Houghland said that Judge Schmidt told him, and Hagenloh said, "That is a lie." From this and other evidence a jury could believe that Houghland was still seeking the missing jewelry, that he sought information for his master, and that he planned to get it by terrorizing Hageloh, and that he struck respondent pursuant to such plan.

It is true that prior to the first blow Hagenloh stated "That is a lie." This statement may have precipitated the blow. But then again it may not have. Since we are convinced that there is some evidence, which, when interpreted favorably to respondent, supports the finding that Houghland acted within his scope of authority, the assignment of error asserting that there was no evidence is not well taken.

This view of the evidence distinguishes Galveston, H. & S. A. Ry. Co. v. Currie, 100 Texas 136, 96 S.W. 1073, 10 L. R. A. N. S. 367. We cannot say that Houghland had "turned aside" from his employment if there is evidence to support the finding by the jury that he acted in furtherance of his master's business and to accomplish an objective of his particular employment. In the Currie case the act of the employee was intended as a personal joke and there was no evidence which gave the slightest inference that it was undertaken in furtherance of the railroad's business or to accomplish an objective of the engine dispatchers' employment.

The majority opinion on page nine cites a number of opinions of the Courts of Civil Appeals, stating that the evidence in each "conclusively showed that the employee in making the assault was actuated by personal animosity and that there was no close relation between the assault and the performance of the duties of the employment." From our review of these cases we are unwilling to agree with the first clause in the majority's statement. But if the majority's second clause—that in those cases "the evidence conclusively showed * * * that there was no close relation between the assault and the performance of the duties of the employment"—means that, under the acknowledged tests of scope of authority, those employees were conclusively shown to be outside, then we agree with it. In none of those cases is it shown that there was any theory made out in the evidence by which the jury could have found that the assaulting employees (a telephone exchange manager, an insurance premium collector, a grocery cashier, an ice deliveryman, a watchman who was off duty, and a lunch counter employee) acted in furtherance of his master's business and at the same time acted to accomplish an objective of his particular job. In contrast to the cases cited by the majority, there are Texas cases in which the employee (who in each case shot his adversary) was found to have been within his scope of authority because the evidence supported a theory by which the employee's act was construed to satisfy both requirements of the scope of authority rule. Chicago, R. I. & G. Ry. Co. et al. v. Carter, et al., 261 SW 135, Tex Com App., 1935; Gulf, C. & S. F. Ry. Co. v. Cobb, Tex. Civ. App., 1931, 45 S.W. 2d 323, error dismissed.

There are two other points which should be considered. The first is petitioner's Point IV to the effect that the jury's finding of scope of authority is invalid because the issue submitted inquired about scope of authority at the wrong time; i.e., at

the time of "accosting" instead of the time of striking. I think this matter was waived by the defendant because his objection to Issue No. 1 did not complain of this deficiency (did not point out specifically that this was a bad issue for this reason), but rather complained simply that there was no evidence to support a finding that plaintiff was in his scope of authority "at said time." Rule 272 and Rule 274.

The other point that should be discussed, in view of our conclusion that this case should be affirmed, is the holding of the Court of Civil Appeals that C. B. Houghland was an adverse witness to respondent under Rule 182. Also petitioner has presented a related point to the effect that the Court of Civil Appeals erred in overruling petitioner's assignment of error that the trial court erred in refusing to rule upon the question whether C. B. Houghland was an adverse witness or not under Rule 182.

On the question as to whether the trial court ruled on the objection that C. B. Houghland was not an adverse witness, we think the trial court did rule on the objection and to the effect that Houghland was not an adverse witness. Plaintiff called Houghland as an adverse witness under Rule 182. Defendant objected on the ground that Houghland had left the employ of defendant some two years previous to the date of trial. The court at that time did not rule on the objection. The examination of the witness by plaintiff proceeded, after the court stated "We will see what the objection is. Go ahead." When the defendant began its cross-examination, the plaintiff objected to leading and suggestive questions, stating, in effect, that under Rule 182, the defendant must examine the witness as though he was the defendant's witness on direct examination. Thereupon, the defendant's counsel stated: "If the Court has any doubt about it, I have the only authority in the State here which is contrary to counsel's statement as to what the law is. He then furnished the Court with the case of Dollahite-Levy Company v. Phillips, et al., 99 S.W. 2d 688, writ dismissed. The Court, after reading the case, overruled plaintiff's objection, and from then on defendant propounded leading questions to the witness and cross-examined the witness in every detail. The witness, Houghland, admitted that, under this cross-examination, it had been so long since the conversation on the night of July 27, 1947, that he could not remember just what was said word for word. When he was asked about the "baggage incident," he answered that he was talking about his right to enter the car

to get Mr. Bishop's mail, and that he wanted to explain to Mr. Hagenloh that he had the authority to do this, and that he wanted to straighten Mr. Hagenloh out on this. The defendant did not move the Court to strike any of the testimony given by Mr. Houghland under examination by plaintiff. In view of the circumstances, and the further fact, as stated in the majority opinion, "that there was no important conflict, except in their testimony as to what was said just before Houghland struck respondent," I cannot see that defendant suffered any injury because of the delayed ruling made by the trial court.

The holding of the Court of Civil Appeals that Houghland was an adverse witness, even though erroneous, does not require a reversal of this case.

The judgment of the Court of Civil Appeals should be affirmed.

Opinion delivered March 5, 1952.

Rehearing overruled April 9, 1952.