Jack GREEN, Appellant,

v.

TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellee.

No. 7220.

Court of Civil Appeals of Texas.

Texarkana.

Sept. 13, 1960.

Rehearing Denied Oct. 4, 1960.

A jury returned a verdict upon which it found that "good cause" existed for the late filing of the claim, and answered all of the issues in a way that appellant should have been entitled to a judgment against the appellee for compensation for permanent total incapacity in a lump sum. Appellant moved for a judgment on the verdict. Appellee moved for a judgment notwithstanding the verdict. The trial court overruled appellant's motion, and granted appellee's motion. The trial court entered a judgment setting aside and disregarding the jury's findings in response to Special Issues that appellant had "good cause" for the late filing of his claim for compensation with the Industrial Accident Board, and that the appellant take nothing of and from the appellee. The appellant has perfected his appeal and brings forward two points of error. He complains of the action of the trial court in granting the motion for the judgment notwithstanding the verdict of the jury, and that the trial court should have granted appellant's motion for judgment for compensation under the provisions of the Workmen's Compensation Laws of Texas for permanent total incapacity in a lump sum

Fulmer, Fairchild & Badders, Nacogdoches, for appellant.

Collins, Garrison, Renfrow & Zeleskey, Ralph M. Zeleskey, Lufkin, Norman, Rounsaville & Hassell, Jacksonville, for appellee.

DAVIS, Justice.

Appellant, Jack Green, sued appellee, Texas Employers' Insurance Association, for permanent total incapacity for an injury he received on August 11, 1956, while employed with S-K Fixture and Church Furniture Company. Appellant's claim was not filed within six months after the injury.

■ We must decide whether or not there is any evidence of *probative force* to support the jury's findings that were set aside and disregarded by the trial court. Such a judgment by the trial court, N.O.V., can be sustained only in the event there is *no evidence of probative force* on which the jury could have made the findings that were set aside and disregarded. Goodloe v. Williams, Tex.Civ.App., 302 S.W.2d 235, error refused; Gulf, Colorado & Santa Fe Ry. Co. v. Deen, 158 Tex. 466, 312 S.W.2d 933, and De Winne v. Allen, 154 Tex. 316, 277 S.W.2d 95.

■ To determine whether there is any evidence of probative force, the evidence will be viewed in the light most favorable to the party against whom the judgment N.O.V. is rendered, disregarding contradictory or adverse evidence, and indulging

every reasonable inference in such party's favor. Texas & P. Ry. Co. v. Hagenloh, 151 Tex. 191, 247 S.W.2d 236; Watson v. Texas Indemnity Ins. Co., 147 Tex. 40, 210 S.W.2d 989.

In the case of Hawkins v. Safety Casualty Co., 146 Tex. 381, 207 S.W.2d 370, 372, Associate Justice Folley had this to say on the question of "Good cause":

> "The term 'good cause' for not filing a claim for compensation is not defined in the statute, but it has been uniformly held by the courts of this state that the test for its existence is that of ordinary prudence, that is, whether the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances. Consequently, whether he has used the degree of diligence required is ordinarily a question of fact to be determined by the jury or the trier of facts. It may be determined against the claimant as a matter of law only when the evidence, construed most favorably for the claimant, admits no other reasonable conclusion. Martin v. Travelers Ins. Co., Tex.Civ.App., 196 S.W.2d 544; Great American Indemnity Co. v. Beaupre, Tex.Civ.App., 191 S.W.2d 883; LaCour v. Continental Casualty Co., Tex.Civ.App., 163 S.W.2d 676; Texas Indemnity Ins. Co. v. Cook, Tex.Civ.App., 87 S.W.2d 830, writ refused.

> "The law is well settled that a bona fide belief of a claimant that his injuries are not serious but trivial is sufficient to constitute good cause for delay in filing a claim. It also has been held a number of times that the advice of a phyician, upon whom a claimant relies, that injuries are not of a serious nature, but are temporary or trivial, is sufficient to justify a claimant's delay until he learns, or by the use of reasonable diligence should have learned, that his injuries are serious. Texas Employers'

Ins. Ass'n v. Roberts, 135 Tex. 123, 139 S.W.2d 80; Texas Employers' Ins. Ass'n v. Frankum, 145 Tex. 658, 201 S.W.2d 800; Texas Employers' Ins. Ass'n v. Clark, Tex.Civ.App., 23 S.W. 2d 405; Consolidated Underwriters v. Pruitt, Tex.Civ.App., 180 S.W.2d 461; Dean v. Safety Casualty Co., Tex.Civ. App., 190 S.W.2d 750; Zurich General Accident & Liability Ins. Co. v. Lee, Tex.Civ.App., 135 S.W.2d 505; Traders & General Ins. Co. v. Jacques, Tex. Civ.App., 131 S.W.2d 133; Texas Employers' Ins. Ass'n v. Fowler, Tex.Civ. App., 140 S.W.2d 545; Federal Underwriters Exchange v. McDaniel, Tex. Civ.App., 140 S.W.2d 979; Gulf Casualty Co. v. Taylor, Tex.Civ.App., 67 S.W.2d 415; Hartford Accident & Indemnity Co. v. Jackson, Tex.Civ.App., 201 S.W.2d 265."

The findings of the jury on the question of "good cause" that were set aside and disregarded by the trial court in rendering a judgment are as follows:

"Special Issue No. 18

"Do you find from a preponderance of the evidence that Jack Green was advised by Dave Sanders, President of S-K Fixture and Church Furniture Company, not later than August 20th 1956, that he would file Jack Green's claim for compensation with the Industrial Accident Board?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

"Special Issue No. 19

"Do you find from a preponderance of the evidence that Plaintiff relied upon such representation, if any, to such an extent that plaintiff refrained from filing claim for compensation sooner than same was actually filed?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

"Special Issue No. 20

"Do you find from a preponderance of the evidence that plaintiff relying on said representation (if you have found that he did) constitutes 'good cause', as that term is defined herein, for not filing his claim for compensation sooner than same was actually filed?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

*"By the term 'Good Cause' as used in this charge is meant whether or not the claimant has used in the prosecution of his claim that degree of diligence which a man of ordinary prudence, situated as plaintiff was, would have used under the same or similar circumstances.*

"Special Issue No. 21

"Do you find from a preponderance of the evidence that Jack Green was assured by Dave Sanders, President of S-K Fixture & Church Furniture Company, about two or three months following August 11, 1956, that his claim for compensation had been filed with the Industrial Accident Board, at Austin?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

"Special Issue No. 22

"Do you find from a preponderance of the evidence that plaintiff relied upon such representation, if any, to such an extent that plaintiff refrained from filing claim for compensation sooner than same was actually filed?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

"Special Issue No. 23

"Do you find from a preponderance of the evidence that plaintiff relying on said representations (if you have found that he did) constitutes 'good cause' as that term is defined herein, for not filing his claim for compensation sooner than same was actually filed?

"Answer 'Yes' or 'No'.

"Answer: 'Yes'.

*"By the term 'Good Cause' as used in this charge is meant whether or not the claimant has used in the prosecution of his claim that degree of diligence which a man of ordinary prudence, situated as plaintiff was, would have used under the same or similar circumstances."* (Emphasis added.)

By the very definition of "good cause" the inquiry is, in effect, whether the claimant was, or was not, negligent in failing to file his claim with the Industrial Accident Board sooner that he did. If there is evidence of the exercise by the claimant of some care and prudence in the prosecution of his claim, the sufficiency of the care exercised presents a jury question. Texas Employers' Ins. Ass'n v. Crain, Tex.Civ. App., 259 S.W.2d 905, writ refused, n. r. e.; and, Texas & Pac. Ry. Co. v. Day, 145 Tex. 277, 197 S.W.2d 332.

██ In the evidence it was shown that the appellant received an electrical shock while wiring in an attic fan with a minimum of 220 volts of electricity. The shock caused blisters on his hands, one ear, and on his right leg. It also caused a severe jerk to his neck, and left him with a numbness that pretty well covers the entire left side of his body, arm and leg. It also affected his privates. This injury, according to the doctor who testified, was sufficient to have caused a ruptured cervical disc and a ruptured disc in the lower part of his back. The doctor testified that in his opinion the man was suffering from such injuries, and in his opinion, his injuries were total and permanent.

On the day following the accident the appellant went to a hospital where he was visited by David Sanders, who, according to

the evidence, had always been a close personal friend of the appellant. While he was in the hospital, or shortly thereafter, he was advised by Mr. Sanders that he would have to sign some papers to file with the Industrial Accident Board. The appellant testified that he went to the office immediately and the papers were filled out by a Mr. Morris; that he signed them and was told by Mr. Morris that one of them would be mailed to the Industrial Accident Board, one to the Insurance Company, and one would be kept by the Company.

Appellant soon went back to doing light work at the plant, and he continued to draw $100 per week every week, whether or not he worked or was in the hospital.

The first doctor he went to see was Dr. Martin in Jacksonville. About two weeks after his injury Dr. Martin sent him to Galveston to see a Dr. Jackson. Dr. Jackson prescribed traction for appellant. Appellant followed the Doctor's orders by using the traction at his home. Appellant made four or five trips to Galveston to see Dr. Jackson, and on one occasion he remained a week there in the hospital. Dr. Jackson referred appellant to a Dr. Thompson on two occasions for treatment for the effect of the injury upon his privates. He later saw Dr. E. L. Mahon in Jacksonville, the doctor who testified upon the trial of the case.

Bear in mind that during all of this time the appellant was still receiving his $100 per week salary. The appellee made an appointment for him to go to Dr. Leland G. Wilcox in Tyler on May 14, 1958. This date was long after the six months period of time after the injury. An agent for the insurance company about that time, or shortly thereafter, went to see appellant and took a statement from him, and shortly before the termination of his employment the adjuster went back to see him. Now bear in mind that Mr. Sanders had told the appellant on several occasions that his claim for compensation had been filed with the Industrial Accident Board. The last time that he remembered him saying that was at least three months after the injury. In order to be fair with the appellee we will quote at length from the testimony of the appellant as follows:

"Q. Now, let's go back to Monday, two days after you had your injury. I believe you said that Mr. David Sanders came to the hospital room where you were? A. Yes, sir.

    \*    \*    \*    \*    \*    \*

"Q. When was it, Jack, if you had a talk with David Sanders following your injury, when was it that you had the first talk with him? A. Well, we talked up there the following Monday, I don't know if it was at that time or a day or so later that he told me that I would have to fill out some papers in the office when I could get up there with Slick Morris. He was in the office up there at that time.

    \*    \*    \*    \*    \*    \*

"Q. This conversation that we are about to go into, when was that made and where? A. Well, I don't know whether it was made right there in the hospital or the day that I went back to the job.

    \*    \*    \*    \*    \*    \*

"Q. When was it? A. It was just a few days after.

"Q. Well, can you tell us whether it was in the hospital or when you went back on the job? A. No, sir, I can't.

"Q. Well, how many days would you say would be the outside of time that it would have been? A. It was less than a week.

"Q. All right. And tell us what it was that Mr. David Sanders told you on that occasion. A. He said they had some papers and forms to fill out in the office and for me to go up there and sign them.

"Q. Concerning what? A. He said they concerned the insurance, the Industrial Accident Board and concerning my injury.

"Q. All right. And told you to go where to get them filled out? A. To sign them up in the office.

"Q. Did you go up in the office? A. Yes, sir.

"Q. How soon after that did you go to the office? A. That day. I was there on the job or I went just as soon as I could get up there. It was within the week.

"Q. And did you sign some papers? A. Yes, sir.

"Q. Who had the papers or who filled out the papers? A. Mr. Morris.

"Q. And what Mr. Morris is that? A. I don't know his initials, they call him Slick Morris.

"Q. Well, what position did he hold with S & K Company? A. Bookkeeper, purchasing agent with SK.

"Q. Did he tell you what the papers were for? A. Yes, sir.

*    *    *    *    *    *

"Q. And what were you told those papers that you were to sign were for? A. There was one to keep in the office and one to send to the Industrial Accident Board and one to the insurance company.

"Q. Did you sign those papers? A. Yes, sir.

"Q. Did you read them? A. No, sir.

"Q. All right. You did not read them? A. No, sir.

*    *    *    *    *    *

"Q. When was the next time you saw and talked to Mr. David Sanders, if you did, about your claim for compensation being filed with the Indus-

trial Accident Board? A. That was several times.

"Q. Well, how soon and what period of time after you got hurt would you say the next talk was? A. It was all along, but it wasn't very long after that.

*    *    *    *    *    *

"Q. Jack you said that you talked with Mr. Dave Sanders within a week after you got hurt? A. That's right.

"Q. You don't recall just where it was? A. No, sir.

"Q. Whether it was in the hospital or up there? A. No, sir.

"Q. Now, at that time that you talked to him, it was within a week, state whether David Sanders told you anything in that statement with reference to what he or the S & K Company was going to do for you in the way of filing your claim with the Industrial Accident Board for your injury that you had just received?

*    *    *    *    *    *

"Q. If he told you anything other than what he just said there now, if he told you that, tell us what all he said? A. Yes, sir, he said that they were taking care of all of that.

"Q. All of what? A. The insurance and they had filed a claim.

"Q. With whom? A. The Industrial Accident Board and the Compensation Insurance.

*    *    *    *    *    *

"Q. Were you or not a good friend to Mr. Davis Sanders?

*    *    *    *    *    *

"Q. Were you or not a good friend of Mr. Slick Morris? A. Yes, sir.

"Q. Did you have confidence in their word and believe them? A. Absolutely.

"Q. Did you believe that they had taken care of your claim for you? A. Absolutely and definitely.

"Q. State whether or not you continued to believe that your claim was taken care of at all times on down to the time that you hired your lawyers? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. I am asking you whether or not Mr. David Sanders on occasions other than the one you told about and before six months time had gone following your injury told you anything, I am not asking you for the moment that he told you, whether he made some statements or a statement to you having to do with whether or not S & K Company had taken care of the filing of your claim for compensation with the Industrial Accident Board? A. Yes, sir, several times.

"Q. All right, now give us an idea as best you can, how soon after his first conversation that you told about which was within a week, how soon were the other conversations? A. Well, it was all along, it wasn't very long after that.

"Q. Well, very long, ten minutes or ten days?

"A. Two or three weeks.

"A. It had all been taken care of. They had filed my claim for compensation insurance.

"Q. Did you rely upon it? A. Certainly.

"Q. Did you believe that he had done it? A. Yes, sir. I believed every word of it.

"Q. Was that the last time that he made a statement along that line or did he again later? A. Later.

"Q. How much later? A. Well, about, sometime after then he was talking out in the shop and———

\*   \*   \*   \*   \*   \*

"Q. Can you tell us about how long after your injury it was, this time that you are speaking of in the workshop there that Mr. Sanders talked to you? A. Possibly three months.

"Q. Possibly three months. A. Yes, sir.

"Q. And what did he tell you on that occasion? A. That I didn't have anything to worry about that it had been taken care of, the compensation insurance had all been taken care of.

"Q. Did you ever at any time have any cause or reason to disbelieve that your claim had been properly filed and taken care of with the Industrial Accident Board? A. No, sir.

"Q. Did you ever have any cause to believe that it was necessary for you to do anything in the way of preparation of claim or notice to comply with the law about your compensation? A. No, sir.

"Q. Did you ever have any doubt at all that the promises of those two gentlemen that you named, Mr. Morris and Mr. Sanders, was going to be carried out, did you ever have any doubt about it? A. Not one minutes doubt.

"Q. And later after you were told by Mr. Sanders that it had been done, that your claim had been filed with the Industrial Accident Board did you ever have any doubt that it had been done until after you had hired us? A. No, sir."

We find further the following testimony of Mrs. Raymond Warren which corroborates the testimony of the appellant:

"Q. State whether or not some two or three months following the injury of your brother that you were in the home of your brother and Dave Sanders visited your brother? A. He did.

"State whether or not you were present and heard a discussion between your brother and Dave Sanders?

\*　\*　\*　\*　\*　\*

"A. I was.

\*　\*　\*　\*　\*　\*

"Q. State whether or not your brother on the occasion we are talking about asked Mr. Sanders whether Mr. Sanders had fixed or seen to the filing, well we will just confine it to what he said that he had done. State whether or not he said that he filed the necessary forms and claim blanks with the Industrial Accident Board at Austin, Texas, for your brother's workmen's compensation insurance for his injury at the plant. A. He did say that.

"Q. All right. And what was the answer Mr. Dave Sanders made? A. He assured him that everything had been taken care of. That all forms and everything had been taken care of and filed with the Industrial Board in Austin."

Then we find that Mr. Sanders testified, on cross-examination, as follows:

"Q. And you never did tell him in response to any question or voluntarily either that he had no worries about it or words to that effect, just like I have told you Jack, you would have nothing to worry about your claim that we have already fixed up the necessary forms and claims and they have been filed with the Industrial Accident Board for your workmen's compensation insurance? A. I might have said something to that effect, if he was entitled to it that he would be taken care of, certainly."

The appellant regarded his boss, David Sanders, the President of S-K Fixture and Church Funiture Company, as a personal friend of his. Thomas Grady Griffin, Office Manager for S-K Fixture and Church Furniture Company, testified that it was one of his duties to fill out the employer's first report of injury on the appellant, and on August 20, 1956, he filled out such notice, reciting the injury to have occurred on August 11, 1956. He admitted that he saw and talked with Green on the 20th of August, 1956, to get information from him on the injury.

His services were discontinued with the employer as of July 24, 1958. On September 2, 1958, he went to his attorneys and employed them to represent him in the case. A notice of injury and claim for compensation for appellant's injuries was prepared, and was filed with the Industrial Accident Board in Austin, Texas, on September 4, 1958.

We believe that upon the verdict of the jury, the pleadings, and the stipulation of the parties, that the evidence is of such probative force appellant was, and is, entitled to have a judgment entered in his favor.

The attitude of our Courts toward upholding jury findings of "good cause" is expressed in the following quotation from Petroleum Casualty Co. v. Garrison, Tex. Civ.App., 174 S.W.2d 74, 77, writ refused, want of merit:

"The holding of our courts that the filing of claim within six months is jurisdictional is harsh and frequently tends to work great injustice. For that reason, no doubt, the courts as a general rule have been rather liberal in upholding findings of good cause. Many excuses or reasons for delay have been recognized, as a reading of the cases will show."

The appellant's points of error are sustained.

Appellee brings forward two counterpoints of error. The counterpoints are without merit and are overruled.

Appellee also brings forward ten cross points of error. In the first eight, it

raises complaints on the question of good cause. What we have already said in this opinion takes care of those points, and they are respectfully overruled.

In cross point 9 it says that there was error in the jury finding that appellant suffered permanent total incapacity was so contrary to the overwhelming weight and preponderance of the evidence as to demonstrate that the jury was actuated by passion, prejudice, or some other motive in the rendition of the verdict, and by cross point 10 it says that the evidence is insufficient to support the jury finding that the appellant sustained permanent total incapacity as the result of the injury. We have examined the evidence of record very carefully, and find that the evidence is fully sufficient to support the jury verdict. The cross points 9 and 10 are overruled.

For the errors hereinabove pointed out the judgment of the trial court is reversed, and judgment is here rendered for the appellant.