Ted GREEN, Appellant,

v.

Donnie Joe JACKSON and Higginbotham-Bartlett Lumber Company, Appellees.

No. 07–82–0390–CV.

Court of Appeals of Texas, Amarillo.

May 30, 1984.

Rehearing Denied July 24, 1984.

Thomas J. Griffith, Ralph H. Brock, Lubbock, for appellant.

Thompson & Thomas, George L. Thompson III, Crenshaw, Dupree & Milam, Philip Johnson, Lubbock, for appellees.

Before DODSON, COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Ted Green (herein Green) brings this appeal from a summary judgment in favor of Higginbotham-Bartlett Lumber Company (herein Company). We affirm the judgment of the trial court.

This appeal arises out of a suit filed by Green against the Company and a co-defendant, Donnie Joe Jackson (herein Jackson). In the suit, Green sought damages resulting from an alleged assault and battery committed on or about May 21, 1980 by Jackson upon Green. In the suit, Green asserted liability on the part of the Company because at the time Jackson was the assistant manager of the Company's lumber yard in Matador, was temporarily in charge, and was allegedly acting in that capacity when he committed the acts about which complaint was made.

In attacking the action of the trial court, Green raises four points of asserted error. He argues the court erred in rendering the summary judgment because: (1) the Company failed to prove it was entitled to judgment as a matter of law; (2) a genuine issue of fact existed as to whether the assault and battery occurred within the course and scope of Jackson's employment; (3) such an issue of fact existed as to whether the Company had permitted its employee to mix his own private affairs with his managerial duties in such a manner that they could not be separated; and (4) such an issue of fact existed as to whether the Company ratified the commission of Jackson's assault and battery upon Green.

 In summary judgment cases the judgment granted should be affirmed only if the record establishes a right thereto as a matter of law and the movant establishes that he is entitled to the judgment by reason of the matters set out in the motion. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671 (Tex.1979); *Gibbs v. General Motors Corporation,* 450 S.W.2d 827, 828 (Tex.1970); *Harrington v. Young Men's Christian Ass'n of Houston,* 452 S.W.2d 423, 424 (Tex.1970). The burden of demonstrating the lack of a genuine issue of material fact is upon the movant and all doubts are resolved against him. *Womack v. Allstate Insurance Company,* 156 Tex. 467, 296 S.W.2d 233, 235 (1956); *Durham v. Cannan Communications,*

*Inc.*, 645 S.W.2d 845, 852 (Tex.App.—Amarillo 1982, writ dism'd). It is in the light of this teaching that we examine the record in this case.

Green's testimony reveals that, approximately one year previous to the date here in question, Green had done some remodeling work upon a house belonging to Jackson. Apparently, the work was begun under an agreement that Green would "tradeout" this work for other work to be done by Jackson. However, according to Green, "it got to where he wanted me to do more for him than he was doing for me and it came up that he owed me some money and he wouldn't pay me." A dispute arose about the amount, if any, Jackson owed Green. Later, after meeting at the lumber yard, the two had a meeting at the Matador city well and, according to Green, Jackson agreed to pay Green the sum of $150.00, which was not paid. The dispute continued and later, when Green had come to the lumber yard to "do business," Jackson came out to Green's pickup and "wanted to start it right there." Green walked away and no fight resulted.

Another encounter resulted when Green went to the lumber yard and was loading lumber. He saw two friends of his who "drove over to where I was at" and, referring to Jackson, said "he called you every name in the book." According to Green, Jackson "then came up behind me and tried to start another fight" but Green drove off and "left him there." The next encounter again resulted at the lumber yard at a time when Green said "the manager was waiting on me." Jackson, according to Green, "started another ruckus." He walked off to his, Green's, pickup at the back of the yard to put his stuff in it and Jackson "told me to get away from the pickup, he was going to whip my butt." Again, Green left. Green was unable to put exact dates on these occasions but they all happened prior to May 21, 1980. Green also testified that throughout this period Jackson refused to wait on him anytime Green went to the lumber yard.

On the day in question, which was May 21, 1980, Green, accompanied by his son, made two trips to the Company's lumber yard in Matador. The first trip was around 9:00 a.m. and the second around 11:00 a.m. On the first trip, Green was waited upon by an employee named Ricky Turner. Green and Turner went into a balcony to procure some lumber and, according to Green, Jackson stuck his head out of a door and said "don't you all mess up that damn lumber." When finished, Green told Turner "tell him the lumber is stacked up better than it was to start with" and left.

Upon Green's return, again waited upon by Turner, he loaded some lumber and, needing some nails, went into the lumber yard when "Jackson came from in front of the lumber yard with something in his hand." Again, according to Green, "he hit me and knocked me partly unconscious. Then he jumped on me and we went to the floor and Mr. Turner grabbed my son and held him back." The altercation resulted in the injuries which are the subject of the suit.

Jackson's version of the 9:00 a.m. conversation was that he told Turner to get the lumber straightened up and that Green then called him a "son-of-a-bitch." Jackson did nothing at the time but when he left for lunch, prior to Green's second trip, he left word for the other employees to call him when Green returned. They did and he, Jackson, immediately returned to the yard in the yard manager's pickup. The altercation giving rise to the suit then ensued.

Appellant briefs and argues points one and two together and we will likewise consider them together. The thrust of appellant's argument under these points is that Green's testimony, substantially supported by that of his wife and son, is that the "grudge" resulted at least in part from the way that Jackson, as an employee of the Company, had treated Green whenever he tried to do business there with the immediate provocation being the conversation about stacking the lumber wherein he was called a "son-of-a-bitch." That, he continues, coupled with evidence that Jackson's

supervisor had been aware of Jackson's behavior in refusing to wait on Green and in attempting to start fights, raises the issue as to whether the altercation grew out of Jackson's duties as an employee and, thus, the Company's vicarious liability for his actions.

The established general rule in Texas is that it is not ordinarily within the scope of a servant's authority to commit an assault on a third person. Such an assault is usually an expression of personal animosity and is not for the purpose of carrying out the master's business. Therefore, the cases in which liability has been imposed upon the master for his servant's assault are comparatively few. *See Texas & P. Ry. Co. v. Hagenloh*, 151 Tex. 191, 247 S.W.2d 236, 239 (1952).

In considering the question of exceptions to this general rule there appear to be two divergent lines of authority in Texas. The first line of cases employs the "rule of force." That rule provides before an employer could be held liable for the assault and battery of its servant, the employer must have authorized the act, either expressly or impliedly, by placing the individual in a position which involved the use of physical force itself. Under that rule, a plaintiff has to allege and prove that the servant's position was one that permitted the use of force and, if not, there can be no recovery. *See Texas & P. Ry. Co. v. Hagenloh, supra; Dart v. Yellow Cab, Inc.*, 401 S.W.2d 874 (Tex.Civ.App.—Amarillo 1966, writ ref'd n.r.e.).

The second line of cases employs a test somewhat more liberal. They hold the test of the master's liability is not whether the servant's employment contemplated the use of force, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do. However, even under that rule, a plaintiff is denied recovery if the plaintiff at the time of the assault was not acting within the scope of his employment but was furthering his own interest. *See Smith v. M System Food Stores*, 156 Tex. 484, 297 S.W.2d 112 (1957);

*Humbert v. Adams*, 361 S.W.2d 458 (Tex. Civ.App.—Dallas 1962, no writ); *Sheffield v. Central Freight Lines, Inc.*, 435 S.W.2d 954 (Tex.Civ.App.—Dallas 1968, no writ).

Green recognizes the divergency of these views and suggests that the "rule of force" may have been supplanted by the more liberal "scope of employment" test. However, such a holding is not necessary in this case since we do not believe Green is entitled to recover under either view.

In determining the question, we find to be both persuasive and helpful the reasoning employed by the court in the cases of *Texas & P. Ry. Co. v. Hagenloh, supra; Humbert v. Adams*, 390 S.W.2d 857 (Tex. Civ.App.—Dallas 1965, writ ref'd n.r.e.); and *Rosales v. American Buslines, Inc.*, 598 S.W.2d 706 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.).

In *Hagenloh*, Houghland, the defendant's employee who committed the assault in question became incensed at the plaintiff because the latter called him a liar. At the time of that dialogue Houghland, a special agent, was engaged in trying to find property missing from luggage which had been checked with the railroad. The Supreme Court held that Houghland, in striking the plaintiff, was not carrying out the railroad's business, but was carrying on an enmity that had developed between him and the plaintiff.

In the 1965 *Humbert v. Adams* case, which was an appeal from a summary judgment for the defendant, the plaintiff was an inspector for the State Highway Department and Sears, the employee concerned, was employed by the defendant construction contractor. In their respective capacities Humbert and Sears, without animosity, discussed some engineering errors. This was followed by a discussion between the two men and a resident engineer. As a result of these discussions Sears agreed to correct the problem. Sears then went to his supervisor, who told Sears that Humbert had already talked to the supervisor and in that conversation remarked that Sears had talked to the resident engineer and "... I'd better go down there, he will

go down there and tell him a bunch of damn lies." Sears then confronted Humbert and asked why he had made the remark, whereupon Humbert replied, "Well, he is just like you, he is a god-damn liar. I didn't say it." Sears thereupon assaulted Humbert giving rise to that law suit. The court there emphasized that there was no rancor between the parties at the initial discussion nor until the confrontation mentioned above. The court found the assault arose out of that confrontation which, it said, was a "purely personal" encounter having nothing to do with Sears' employment.

In *Rosales*, which was also an appeal from a summary judgment, both the plaintiff, Rosales, and one Jesus Herren were employed by the appellee American Buslines. Rosales, while off duty and on his way to a union meeting, stopped by the appellee's place of business and was talking there to two off-duty female employees. Herren was on duty when he encountered Rosales. A fight ensued resulting in injury to Rosales and that lawsuit. The court there held the assault was a result of a grudge which arose between Rosales and Herren which "arose several weeks before the fight" and any connection with the employment was too remote to be considered as a part of the assault.

■ We believe the summary evidence and, in particular the testimony of Green and Jackson, establishes that at the time of the May 26, 1980 fight, Jackson was not acting in furtherance of his master's business, but the fracas was the outgrowth of a long-simmering and rancorous personal animosity arising out of the asserted debt owed by Jackson to Green, and the incident was, therefore, the result of a purely personal dispute which was not connected with Jackson's employment. Points of error one and two are overruled.

■ In points three and four, appellant asserts fact issues existed as to whether the Company had permitted Jackson to mix his own private affairs with managerial duties in such a way that the acts could not be separated and whether the Company had ratified the commission of Jackson's assault and battery upon Green.

In support of his proposition that the Company ratified the actions of Jackson, Green argues that the testimony showed that Jackson utilized his position as an employee of the Company to harass and antagonize Green. In particular, he points to testimony that Jackson would not wait on Green and, on three occasions, according to Green, tried verbally to provoke a fight when Green came in as a customer, at least one of which occurred when Green was being waited upon by the yard manager.

Green also argues that Jackson utilized his supervisory authority as acting manager over Dorothy and Ricky Turner, the other yard employees, to require them to notify him when Green returned on the day in question. After the fight, the employees cleaned up the blood in the store and the Company's district manager told the Greens that Jackson would not be fired and the Company would make no settlement for Green's medical bills and lost work. This evidence, Green argues, raised the fact issue of ratification.

In *Home Telephone & Electric Co. v. Branton*, 7 S.W.2d 627, 629 (Tex.Civ.App. —Eastland 1928), *aff'd*, 23 S.W.2d 294 (Tex. Comm'n App.1930, judgmt aff'd), the court was confronted with a somewhat similar situation. In that case the telephone company had erected a pole, guy wire and anchor on Branton's land without permission. Branton protested to the company's local manager Beardon on "more than one occasion," a process which culminated in an assault and battery committed by Beardon upon Branton. In discussing the question of the master's liability the court held that the manager's assault was outside the scope of his employment. In discussing the question of ratification the court held that the company's failure to remove the pole in question did not amount to a ratification of the assault nor did the company's failure to discharge the manager constitute such a ratification.

En route to that conclusion, the court said:

There are but few situations in which one may be constituted a wrongdoer by ratification where such wrong consists of an assault and battery. In the case of *Dillingham v. Anthony*, 73 Tex. 47, 11 S.W. 139, 3 L.R.A. 634, 15 Am.St.Rep. 753, Chief Justice Stayton quotes with approval the following language from Cooley on Torts:

'In order to constitute one a wrongdoer by ratification the original act must have been done in his interest, or been intended to further some purpose of his own.'

Had the evidence justified the conclusion that appellant's officers, after learning of the assault, believed it was justified and approved same, such action would not amount to a ratification of the original act, because it was not done in appellant's interest or in the furtherance of appellant's business or for its benefit.

*Id.* at 629.

We also find helpful the court's reasoning employed in the case of *Sheffield v. Central Freight Lines, Inc.*, 435 S.W.2d 954 (Tex.Civ.App.—Dallas 1968, no writ). In that case both the appellant Sheffield and one Jarvis were truck drivers with Jarvis being employed by the appellee Central Freight Lines, Inc. A controversy arose between the two truck drivers as a result of damage caused by Jarvis to Sheffield's truck. In the course of that discussion Jarvis called Sheffield a "god-damn liar." The supervisors for both drivers were called to the scene. Jarvis' supervisor arrived first, surveyed the scene and told Sheffield that appellee would pay for his truck's damage. When Sheffield's supervisor arrived, he demanded an explanation from Jarvis as to why he called "my man a liar," an action which, in the presence of Jarvis' supervisor, resulted in a melee between Jarvis, Sheffield and Sheffield's supervisor. As a consequence of that fight, the lawsuit arose which resulted in an instructed verdict for Central Freight Lines.

In affirming that verdict, the Dallas court held that "when a servant turns aside from the performance of the work for which he was hired, even though momentarily, and engages in activities not in furtherance of his master's business, but to accomplish some purpose of his own, the master is not responsible for such activities." *Id.* at 955–956. In answering the argument that the failure of Jarvis' supervisor to intervene and attempt to stop the fight amounted to a ratification, the court held there was no legal duty on the part of Central Freight or its supervisor to stop a personal altercation and, hence, no liability on either of them for withholding such interference.

Following the reasoning of the cited cases, since the assault was not within the scope of Jackson's employment or authority, under the summary judgment evidence there was no ratification of Jackson's assault, nor do we think that evidence sufficient to raise a fact issue about liability on the part of appellee arising out of any mixing of Jackson's private affairs with his managerial duties. Points of error three and four are overruled.

There being no reversible error, the judgment of the trial court is affirmed.