NO. 07-02-0472-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



MARCH 12, 2004


__________________________



RANDALL GARRETT and KATHY GARRETT, 



 Appellants


v.



 GREAT WESTERN DISTRIBUTING CO. of AMARILLO,


 d/b/a COORS DISTRIBUTING, a/k/a COORS OF AMARILLO, 



 Appellee

_________________________________



FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;



NO. 90,309-E; HON. JOHN T. FORBIS, PRESIDING


_______________________________



Opinion


_______________________________



Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

 Randall Garrett and his wife Kathy Garrett (the Garretts) appeal from a final
summary judgment denying them recovery against Great Western Distributing Co., d/b/a
Coors Distributing, a/k/a Coors of Amarillo (Great Western). The Garretts sued Great
Western, Scott Riley, Brian Williams, Douglas Dodson and others to redress injuries
resulting from a fight between Randall, Riley, Williams, and Dodson. The fight occurred on
a Friday night in a local bar after Riley allegedly made a comment about or directed to
Kathy Garrett. Randall objected to the comment, and the fight ensued. Riley, Williams and
Dodson worked for Great Western at the time and had worn company uniforms and driven
company cars to the bar. 

 Two issues are before us for consideration. Each involves whether the trial court
erred in granting Great Western's amended no-evidence motion for summary judgment. 
The Garretts believe that it did because their "summary judgment proof raise[d] a fact issue
on every element of their claims" and Great Western "owed a duty to the Garretts." We
affirm the judgment of the trial court.

 Background

 The Garretts state in their appellate brief that despite the numerous allegations of
negligence averred in their pleadings, "[w]hen considered globally, two fundamental claims
are asserted[.]" They consist of Great Western's liability to them based upon 1) "imputed
liability for the wrongful acts of its employees" and 2) the company's "independent
negligence for failing to supervise or control its employees." We adopt the Garretts'
categorization of their claims for purposes of resolving this appeal. 

 Standard of Review

 As previously indicated, the summary judgment upon which the trial court acted was
one of no evidence. That is, Great Western contended the Garretts had no evidence to
support any of their claims. Consequently, we assess the legitimacy of the trial court's
decision via the standard of review described in Kelly v. Demoss Owners Assoc., 71
S.W.3d 419, 423 (Tex. App.-Amarillo 2002, no pet.). That standard obligates us to first
determine the elements of the claim placed in issue by the movant. See Tex. R. Civ. P. 
166a(i) (requiring the movant to specify the elements of the claim as to which there is no
evidence). Then, we must ascertain whether the non-movant (i.e. the Garretts) presented
sufficient evidence to prove the existence of each element. Furthermore, the quantum of
evidence presented must be more than a scintilla, and it rises to that level if it enables
reasonable and fair-minded people to disagree about whether the element was proven. 
Kelly v. Demoss Owners Assoc., 71 S.W.3d at 423. Finally, in deciding whether the non-movant carried its burden, we consider all the evidence of record in the light most favorable
to the non-movant and disregard that which may be disfavorable. Id. 

 First Claim - Imputed Liability

 The Garretts pled that liability for their injuries should be imputed to Great Western
under the theories of respondeat superior and vice-principal. We address the former
allegation first.

 Course and Scope

 An employer is liable, vicariously, for the acts of its servants committed in the course
and scope of their employment. GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 617 (Tex.
1999). And, though they may, assaults seldom fall within that realm. Green v. Jackson,
674 S.W.2d 395, 398 (Tex. App.-Amarillo 1984, writ ref'd n.r.e.). This may be because the
authority granted an employee does not ordinarily include the power to attack someone. 
Texas & P. Ry Co. v. Hagenloh, 151 Tex. 191, 247 S.W.2d 236, 239 (1952); Wrenn v.
G.A.T.X. Logistics, Inc., 73 S.W.3d 489, 494 (Tex. App.-Fort Worth 2002, no pet.); Green
v. Jackson, 674 S.W.2d at 398. Indeed, as recognized by our own Supreme Court,
"[u]sually assault is the expression of personal animosity and is not for the purpose of
carrying out the master's business." Texas & P. Ry Co. v. Hagenloh, 247 S.W.2d at 239;
Kelly v. Stone, 898 S.W.2d 924, 927 (Tex. App.-Eastland 1995, writ denied); Green v.
Jackson, 674 S.W.2d at 398. So, to impute responsibility for such an intentional act to an
employer, it is encumbent upon the plaintiff to prove that the assault was closely connected
with the servant's authorized duties, GTE Southwest, Inc. v. Bruce, 998 S.W.2d at 617-18;
Houston Transit Co. v. Felder, 146 Tex. 428, 208 S.W.2d 880, 881-82 (1948), and not the
result of personal animus. GTE Southwest, Inc. v. Bruce, 998 S.W.2d at 617-18; Texas &
P. Ry Co. v. Hagenloh, 247 S.W.2d at 239-41. In other words, it must be shown that the
act arose directly out of and was done in the prosecution of the business for which the
servant was hired. Texas & P. Ry Co. v. Hagenloh, 247 S.W.2d at 239-40; Wrenn v.
G.A.T.X. Logistics, Inc., 73 S.W.3d at 493-94; Green v. Jackson, 674 S.W.2d at 398. 

 More importantly, we take care to highlight the concept of proximity implicit within
this rule. It is not enough that the tort can simply be traced back to the performance of
one's duties. Texas & P. Ry Co. v. Hagenloh, 247 S.W.2d at 240-41. As recognized by
our Supreme Court in Hagenloh, if the connection is too remote then the employer is not
responsible. Id. Furthermore, how proximate this link between the job and tort must be is
exemplified in Houston Transit. There, the court found the link to be sufficiently close. And,
in arriving at that conclusion, it observed that "[w]hether Goodson [the employee of Houston
Transit] was acting within the scope of his employment on the occasion in question
depends in large measure upon why he went to Felder's car after the collision." Houston
Transit Co. v. Felder, 208 S.W.2d at 882. Goodson was driving a bus when it collided with
a vehicle driven by Felder. A fight erupted between the two when Goodson exited the bus
and approached Felder. Why Goodson approached the car, according to the court, "was
something to which Felder could not testify, since it was peculiarly within Goodson's
knowledge[.]" Id. Nevertheless, Goodson "testified positively that his purpose was to
secure information for his employer." So, what we have in Houston Transit is evidence of
1) a collision 2) followed by Goodson approaching Felder to obtain information for his
employer about the accident "as [Goodson admitted] it was his duty to do" and 3) Goodson
striking Felder immediately upon encountering him. Id. at 881. Simply put, Goodson's
appearance in front of Felder immediately before the fight broke out was due to his
performance of an employment duty. And, this was the specific basis on which the
Supreme Court distinguished the circumstances in Texas & P. Ry Co. v. Hagenloh (wherein
liability was not imputed to the master) from Houston Transit. 

 The holding in Houston Transit, according to the Supreme Court in Hagenloh, was
"based upon the evidence that Goodson, in keeping with his duties, went immediately after
the collision to Felder's automobile to get information, and that while he was thus about his
master's business and before he had finished the mission, he committed the assault." 
Texas & P. Ry Co. v. Hagenloh, 247 S.W.2d at 241 (Emphasis supplied). In contrast, while
the employee in Hagenloh first approached his victim "to talk about the baggage incident,"
per his employment duties, the words he uttered showed that his "intention was to abuse
and revile respondent rather than to obtain information. . . . " Id. at 240-41. Furthermore,
"[t]he encounter was, or immediately became, personal, and . . . [t]he words and the assault
that followed were the expression of contempt and animosity, and they were not in
pursuance of the employer's business." Id. So, as can be seen from both Houston Transit
and Hagenloh, the circumstances and mens rea of the employee existent immediately
before the assault occurs are pivotal, if not dispositive. See Texas & P. Ry Co. v.
Hagenloh, 247 S.W.2d at 241 (stating that the rule is that "'when the servant turns aside,
for however short a time, from the prosecution of the master's work to engage in an affair
wholly his own, he ceases to act for the master, and the responsibility for that which he
does . . . is upon him alone'"). With that said, we turn to the case before us. Appearing of record is evidence that 1) Riley, Williams, and Dodson wore their company
uniforms and drove their company cars to the bar, 2) Great Western had a policy dictating
that its cars were only to be used for company business and uniforms were to be worn only
while working, 3) employees were on the job, so to speak, until they returned their car, 4)
Riley, Williams, and Dodson bought themselves drinks at the bar, 5) Great Western
employees who socialized at a bar that acquired product from Great Western fostered
Great Western's image and constituted "good business," 6) Great Western employees were
to always ask themselves if what they were doing was good for the company, 7) another
Great Western employee at the bar remarked, after the fight, that "they weren't
representing Coors very well," and 8) Great Western disciplined its employees for engaging
in the fight. Assuming arguendo that the foregoing is more than a scintilla of evidence from
which a reasonable factfinder could infer that Riley, Williams, and Dodson appeared at the
bar to pursue their employer's business, it is no evidence that Great Western authorized
their use of force in any way while doing so. Nor is it any evidence that the assault was
closely connected to or arose immediately from the pursuit of those duties. Indeed, the
Garretts refer us to nothing of record purporting to illustrate how and why the fight erupted. 
They say nothing in their brief about what Randall and the employees of Great Western
were doing immediately before blows were thrown even though those circumstances are
pivotal. 

 However, perusal of the undisputed summary judgment evidence before us
discloses that one or more of the employees were playing pool and that they were
"'pointing" and "hiding" in a manner which indicated to Randall that they "were going to start
trouble." Furthermore, according to Randall, Riley uttered some comment, in response to
which (and while the two were within feet of each other) Randall said, "You ain't going to
talk to my wife that way[.]" Immediately thereafter, the first blow was struck by a Great
Western employee. What the substance of Riley's comment was goes unmentioned as
does whether it related to the business of Great Western. Nonetheless, this evidence of
what happened immediately before the brawl commenced does not permit one to
reasonably infer that Riley, Williams, and Dodson were pursuing the business of Great
Western at the time or intending to pursue it. Rather, it indicates that the group engaged
in the fight out of some animosity developing between Riley and the Garretts. Given this,
we cannot say that the Garretts presented more than a scintilla of evidence that the assault
occurred while Riley, Williams, and Dodson were within the course and scope of their
employment. And, there being no evidence that they were acting within the scope of their
employment, the trial court did not err in granting Great Western summary judgment on this
issue.

 Second Claim - Vice-Principal

 The Garretts proffered a second ground through which they sought to impute liability
to Great Western. It involved the theory of vice-principal. Furthermore, Shellia Dodson,
who was with Riley, Williams, and Dodson at the bar, purportedly held such a position
because she was the executive secretary to Great Western's principal owner. As such, she
could "write" and "sign-off" on certain checks, acknowledge the receipt of delivered items,
order office supplies, and had the authority to tell Riley, Williams, and Dodson what to do. (1) 


 To be a vice-principal, the employee must enjoy a measure of authority sufficient to
enable one to consider his acts as those of the company. Fort Worth Elevators Co. v.
Russell, 123 Tex. 128, 70 S.W.2d 397, 406 (1934), overruled on other grounds by Wright
v. Gifford - Hill & Co., 725 S.W.2d 712 (Tex. 1987), (characterizing the acts of a vice-principal as the "very acts of the corporation itself"). The term encompasses four classes
of agents: 1) corporate officers; 2) those with authority to employ, direct, and discharge
employees; 3) those engaged in the performance of non-delegable or absolute duties of
the employer; and 4) those to whom an employer has confided the management of the
whole business or a department or division of the business. Hammerly Oaks, Inc. v.
Edwards, 958 S.W.2d 387, 391 (Tex. 1997); Fort Worth Elevators Co. v. Russell, 70
S.W.2d at 406. And, that one may fall within any of the foregoing categories does not
alone permit attribution of the employee's act to the employer for it must still be shown that
the tortuous act was encompassed within the duties assigned. See Fort Worth Elevators
Co. v. Russell, 70 S.W.2d at 407 (stating that if one is a vice-principal when performing
negligent acts he too is one when acting grossly negligent, "provided, of course, the work
in hand is within the duties delegated to him"). 

 Returning to the record before us, we find nothing suggesting that Shellia held the
post of corporate officer. Nor does any evidence of record illustrate that she performed
some non-delegable or absolute duty on behalf of Great Western. So, neither of those two
classes can be used to establish her as a vice-principal. 

 Nor does the possibility that she had some authority to direct the conduct of Riley,
Williams, or Dodson bestow upon her the requisite status. Having some supervisory
authority over others without the ability to hire and fire is not enough. Again, Hammerly and
Fort Worth Elevators describes the authority as the power to "employ, direct, and
discharge." Hammerly Oaks, Inc. v. Edwards, 959 S.W.2d at 391 (Emphasis supplied);
Fort Worth Elevators Co. v. Russell, 70 S.W.2d at 406; accord Magnolia Petroleum Co. v.
Booth, 105 S.W.2d 356, 358 (Tex. Civ. App.-Beaumont 1937, writ ref'd) (holding that Terry,
who was a crew leader, was not a vice-principal because he had neither general
supervisory power over the entire department nor the power to hire and fire anyone in his
crew). 

 Next, combining this ability to simply tell the three individuals what to do with her
permission to write or "sign off on" certain checks, to buy general office supplies, and to
sign for deliveries is still insufficient. Their totality does not reasonably permit one to infer
that Great Western confided the management of the whole business or a department or
division thereof to her. This is so because nothing indicates that she had any general
supervisory control over Great Western or any division or department thereof. Nothing
indicates that she makes or has the power to make decisions about the daily operation of
Great Western or any division or department thereof. Nothing illustrates that she can hire
or fire anyone. And, to the extent that she can do certain things like tell some employees
what to do, sign checks, and the like, nothing illustrates that she can do so autonomously
or whether she must first receive direction from superiors. 

 What is not present in the record renders deficient that which is. Things exist in
context. Out of context, evidence may suggest one thing while in context it may show
something quite different. From what we are told here, Shellia may have some extensive
management authority or the scope of her tasks may be no more than those of a clerk
operating at the behest of her supervisors. From the sparse record before us, we can only
guess at where in the spectrum she lies. So too must we conclude that one viewing the
record in a light most favorable to the Garretts cannot reasonably infer that Great Western
confided in her the management of either the whole business or a department or division
of it. To paraphrase the Supreme Court in Hammerly Oaks, the "evidence on which [the
Garretts] rel[y] is 'meager circumstantial evidence' which could give rise to any number of
inferences, none more probable than another." Hammerly Oaks, Inc. v. Edwards, 958
S.W.2d at 392, quoting Blount v. Borders, Inc., 910 S.W.2d 931 (Tex. 1995). It constitutes
no evidence from which a reasonable factfinder can infer an ultimate fact, id., and,
therefore, the trial court did not err in granting summary judgment on the issue of vice-principal. 

 Claim Three - Negligence

 The last claim we address concerns Great Western's duty to supervise or control its
employees. (2) According to the Garretts, they presented sufficient evidence on each element
of the chose-in-action to avoid summary judgment. We disagree.

 Texas does recognize a cause of action involving the negligent supervision of one's
employees. Furthermore, successfully prosecuting it is not dependent upon a finding that
the employee was acting within the course and scope of his employment. Wrenn v.
G.A.T.X. Logistics, Inc., 73 S.W.3d at 496. This is so because the basis for responsibility
lies in the master's own negligence in omitting to supervise an incompetent employee
whom the master knows or should have known through the exercise of reasonable care
was incompetent and thereby created an unreasonable risk of harm to others. Peek v.
Equipment Services, Inc., 906 S.W.2d 529, 534 (Tex. App.-San Antonio, 1995, no writ)
(involving a claim of negligent hiring, retaining and supervision); see also Dailey v.
Albertson's, Inc., 83 S.W.3d 222, 227-28 (Tex. App.-El Paso 2002, no pet.) (absolving the
employer of liability for negligence because no evidence illustrated that it knew or should
have known of the employee's violent tendencies); Wrenn v. G.A.T.X. Logistics, Inc., 73
S.W.3d at 500 (holding that a fact issue precluded summary judgment because there was
some evidence that the employee was violent and engaged in violent acts while on duty,
which conduct was known to at least one supervisor). 

 Here, there is evidence indicating that Shellia knew that fights could occur in a bar. 
So too does the record illustrate that at least two other individuals who were employed by
Great Western had become embroiled in such a fight. The circumstances surrounding
those brawls and when they occurred go undeveloped, however. Nevertheless, no
evidence appears of record suggesting that Riley, Williams, or Dodson themselves
exhibited violent or aggressive tendencies or engaged in fights at any time before the
incident in question. Nor is there evidence of record suggesting that anyone at Great
Western knew that any of the three had violent propensities before the bar incident. And,
this was fatal for, as illustrated in Peek, Dailey, and Wrenn, the incompetency (or in this
case, the propensity for violence) of the particular employee must or should have
reasonably been known by the employer. Consequently, the trial court did not err in
granting summary judgment on this issue either.

 Accordingly, we overrule each issue of the Garretts and affirm the judgment of the
trial court.


 Brian Quinn 

 Justice 

 

 

 

 
1. We say that she had the ability to "sign-off on" certain checks because the extent of Shellia's
authority to draft against Great Western's bank account was not developed. Additionally, the record discloses
that she could not reimburse employees for their business expenses. So, there was some limitation to her
ability. 
2. Although the Garretts alleged a number of independent acts of negligence in their petition, the only
one they brief on appeal is the failure of Great Western to supervise or control its employees.