NO. 07-02-0472-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

MARCH 12, 2004
_____

RANDALL GARRETT and KATHY GARRETT,

Appellants

v.

GREAT WESTERN DISTRIBUTING CO. of AMARILLO,
d/b/a COORS DISTRIBUTING, a/k/a COORS OF AMARILLO,

Appellee
_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 90,309-E; HON. JOHN T. FORBIS, PRESIDING
_____

*Opinion*
_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

Randall Garrett and his wife Kathy Garrett (the Garretts) appeal from a final summary judgment denying them recovery against Great Western Distributing Co., d/b/a Coors Distributing, a/k/a Coors of Amarillo (Great Western). The Garretts sued Great Western, Scott Riley, Brian Williams, Douglas Dodson and others to redress injuries resulting from a fight between Randall, Riley, Williams, and Dodson. The fight occurred on a Friday night in a local bar after Riley allegedly made a comment about or directed to

Kathy Garrett. Randall objected to the comment, and the fight ensued. Riley, Williams and Dodson worked for Great Western at the time and had worn company uniforms and driven company cars to the bar.

Two issues are before us for consideration. Each involves whether the trial court erred in granting Great Western's amended no-evidence motion for summary judgment. The Garretts believe that it did because their "summary judgment proof raise[d] a fact issue on every element of their claims" and Great Western "owed a duty to the Garretts." We affirm the judgment of the trial court.

### Background

The Garretts state in their appellate brief that despite the numerous allegations of negligence averred in their pleadings, "[w]hen considered globally, two fundamental claims are asserted[.]" They consist of Great Western's liability to them based upon 1) "imputed liability for the wrongful acts of its employees" and 2) the company's "independent negligence for failing to supervise or control its employees." We adopt the Garretts' categorization of their claims for purposes of resolving this appeal.

### Standard of Review

As previously indicated, the summary judgment upon which the trial court acted was one of no evidence. That is, Great Western contended the Garretts had no evidence to support any of their claims. Consequently, we assess the legitimacy of the trial court's decision via the standard of review described in *Kelly v. Demoss Owners Assoc.*, 71 S.W.3d 419, 423 (Tex. App.–Amarillo 2002, no pet.). That standard obligates us to first determine the elements of the claim placed in issue by the movant. *See* TEX. R. CIV. P. 166a(i) (requiring the movant to specify the elements of the claim as to which there is no

2

evidence).  Then, we must ascertain whether the non-movant (*i.e.* the Garretts) presented sufficient evidence to prove the existence of each element.  Furthermore, the quantum of evidence presented must be more than a scintilla, and it rises to that level if it enables reasonable and fair-minded people to disagree about whether the element was proven. *Kelly v. Demoss Owners Assoc.*, 71 S.W.3d at 423.  Finally, in deciding whether the non-movant carried its burden, we consider all the evidence of record in the light most favorable to the non-movant and disregard that which may be disfavorable.  *Id.*

### First Claim – Imputed Liability

The Garretts pled that liability for their injuries should be imputed to Great Western under the theories of respondeat superior and vice-principal.  We address the former allegation first.

### *Course and Scope*

An employer is liable, vicariously, for the acts of its servants committed in the course and scope of their employment.  *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 617 (Tex. 1999).  And, though they may, assaults seldom fall within that realm.  *Green v. Jackson*, 674 S.W.2d 395, 398 (Tex. App.–Amarillo 1984, writ ref'd n.r.e.).  This may be because the authority granted an employee does not ordinarily include the power to attack someone. *Texas & P. Ry Co. v. Hagenloh*, 151 Tex. 191, 247 S.W.2d 236, 239 (1952); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 494 (Tex. App.–Fort Worth 2002, no pet.); *Green v. Jackson*, 674 S.W.2d at 398.   Indeed, as recognized by our own Supreme Court, "[u]sually assault is the expression of personal animosity and is not for the purpose of carrying out the master's business."  *Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 239; *Kelly v. Stone*, 898 S.W.2d 924, 927 (Tex. App.–Eastland 1995, writ denied); *Green v.*

3

*Jackson*, 674 S.W.2d at 398.  So, to impute responsibility for such an intentional act to an employer, it is encumbent upon the plaintiff to prove that the assault was closely connected with the servant's authorized duties, *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d at 617-18; *Houston Transit Co. v. Felder*, 146 Tex. 428,  208 S.W.2d 880, 881-82 (1948), and not the result of personal animus.  *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d at 617-18; *Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 239-41.  In other words, it must be shown that the act arose directly out of and was done in the prosecution of the business for which the servant was hired.  *Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 239-40;  *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d at 493-94; *Green v. Jackson*, 674 S.W.2d at 398.

More importantly, we take care to highlight the concept of proximity implicit within this rule.  It is not enough that the tort can simply be traced back to the performance of one's duties.  *Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 240-41.  As recognized by our Supreme Court in *Hagenloh*, if the connection is too remote then the employer is not responsible.  *Id.*  Furthermore, how proximate this link between the job and tort must be is exemplified in *Houston Transit*. There, the court found the link to be sufficiently close.  And, in arriving at that conclusion, it observed that "[w]hether Goodson [the employee of Houston Transit] was acting within the scope of his employment on the occasion in question depends in large measure upon why he went to Felder's car after the collision." *Houston Transit Co. v. Felder*, 208 S.W.2d at 882.  Goodson was driving a bus when it collided with a vehicle driven by Felder.  A fight erupted between the two when Goodson exited the bus and approached Felder.  Why Goodson approached the car, according to the court, "was something to which Felder could not testify, since it was peculiarly within Goodson's knowledge[.]"  *Id.*  Nevertheless, Goodson "testified positively that his purpose was to

4

secure information for his employer." So, what we have in *Houston Transit* is evidence of 1) a collision 2) followed by Goodson approaching Felder to obtain information for his employer about the accident "as [Goodson admitted] it was his duty to do" and 3) Goodson striking Felder immediately upon encountering him. *Id.* at 881. Simply put, Goodson's appearance in front of Felder immediately before the fight broke out was due to his performance of an employment duty. And, this was the specific basis on which the Supreme Court distinguished the circumstances in *Texas & P. Ry Co. v. Hagenloh* (wherein liability was not imputed to the master) from *Houston Transit*.

The holding in *Houston Transit*, according to the Supreme Court in *Hagenloh*, was "based upon the evidence that Goodson, in keeping with his duties, went *immediately* after the collision to Felder's automobile to get information, and that while he was thus about his master's business and before he had finished the mission, he committed the assault." *Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 241 (Emphasis supplied). In contrast, while the employee in *Hagenloh* first approached his victim "to talk about the baggage incident," per his employment duties, the words he uttered showed that his "intention was to abuse and revile respondent rather than to obtain information. . . . " *Id.* at 240-41. Furthermore, "[t]he encounter was, or immediately became, personal, and . . . [t]he words and the assault that followed were the expression of contempt and animosity, and they were not in pursuance of the employer's business." *Id.* So, as can be seen from both *Houston Transit* and *Hagenloh*, the circumstances and *mens rea* of the employee existent *immediately* before the assault occurs are pivotal, if not dispositive. *See Texas & P. Ry Co. v. Hagenloh*, 247 S.W.2d at 241 (stating that the rule is that "'when the servant turns aside, for however short a time, from the prosecution of the master's work to engage in an affair

5

wholly his own, he ceases to act for the master, and the responsibility for that which he does . . . is upon him alone'"). With that said, we turn to the case before us. Appearing of record is evidence that 1) Riley, Williams, and Dodson wore their company uniforms and drove their company cars to the bar, 2) Great Western had a policy dictating that its cars were only to be used for company business and uniforms were to be worn only while working, 3) employees were on the job, so to speak, until they returned their car, 4) Riley, Williams, and Dodson bought themselves drinks at the bar, 5) Great Western employees who socialized at a bar that acquired product from Great Western fostered Great Western's image and constituted "good business," 6) Great Western employees were to always ask themselves if what they were doing was good for the company, 7) another Great Western employee at the bar remarked, after the fight, that "they weren't representing Coors very well," and 8) Great Western disciplined its employees for engaging in the fight. Assuming *arguendo* that the foregoing is more than a scintilla of evidence from which a reasonable factfinder could infer that Riley, Williams, and Dodson appeared at the bar to pursue their employer's business, it is no evidence that Great Western authorized their use of force in any way while doing so. Nor is it any evidence that the assault was closely connected to or arose immediately from the pursuit of those duties. Indeed, the Garretts refer us to nothing of record purporting to illustrate how and why the fight erupted. They say nothing in their brief about what Randall and the employees of Great Western were doing immediately before blows were thrown even though those circumstances are pivotal.

However, perusal of the undisputed summary judgment evidence before us discloses that one or more of the employees were playing pool and that they were

6

"'pointing" and "hiding" in a manner which indicated to Randall that they "were going to start trouble." Furthermore, according to Randall, Riley uttered some comment, in response to which (and while the two were within feet of each other) Randall said, "You ain't going to talk to my wife that way[.]" Immediately thereafter, the first blow was struck by a Great Western employee. What the substance of Riley's comment was goes unmentioned as does whether it related to the business of Great Western. Nonetheless, this evidence of what happened immediately before the brawl commenced does not permit one to reasonably infer that Riley, Williams, and Dodson were pursuing the business of Great Western at the time or intending to pursue it. Rather, it indicates that the group engaged in the fight out of some animosity developing between Riley and the Garretts. Given this, we cannot say that the Garretts presented more than a scintilla of evidence that the assault occurred while Riley, Williams, and Dodson were within the course and scope of their employment. And, there being no evidence that they were acting within the scope of their employment, the trial court did not err in granting Great Western summary judgment on this issue.

### *Second Claim – Vice-Principal*

The Garretts proffered a second ground through which they sought to impute liability to Great Western. It involved the theory of vice-principal. Furthermore, Shellia Dodson, who was with Riley, Williams, and Dodson at the bar, purportedly held such a position because she was the executive secretary to Great Western's principal owner. As such, she could "write" and "sign-off" on certain checks, acknowledge the receipt of delivered items,

7

order office supplies, and had the authority to tell Riley, Williams, and Dodson what to do.[1]

To be a vice-principal, the employee must enjoy a measure of authority sufficient to enable one to consider his acts as those of the company. *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 406 (1934), *overruled on other grounds by Wright v. Gifford - Hill & Co.,* 725 S.W.2d 712 (Tex. 1987), (characterizing the acts of a vice-principal as the "very acts of the corporation itself"). The term encompasses four classes of agents: 1) corporate officers; 2) those with authority to employ, direct, and discharge employees; 3) those engaged in the performance of non-delegable or absolute duties of the employer; and 4) those to whom an employer has confided the management of the whole business or a department or division of the business. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997); *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d at 406. And, that one may fall within any of the foregoing categories does not alone permit attribution of the employee's act to the employer for it must still be shown that the tortuous act was encompassed within the duties assigned. *See Fort Worth Elevators Co. v. Russell*, 70 S.W.2d at 407 (stating that if one is a vice-principal when performing negligent acts he too is one when acting grossly negligent, "provided, of course, the work in hand is within the duties delegated to him").

Returning to the record before us, we find nothing suggesting that Shellia held the post of corporate officer. Nor does any evidence of record illustrate that she performed

---

[1]We say that she had the ability to "sign-off on" *certain* checks because the extent of Shellia's authority to draft against Great Western's bank account was not developed. Additionally, the record discloses that she could not reimburse employees for their business expenses. So, there was some limitation to her ability.

some non-delegable or absolute duty on behalf of Great Western. So, neither of those two classes can be used to establish her as a vice-principal.

Nor does the possibility that she had some authority to direct the conduct of Riley, Williams, or Dodson bestow upon her the requisite status. Having some supervisory authority over others without the ability to hire and fire is not enough. Again, *Hammerly* and *Fort Worth Elevators* describes the authority as the power to "employ, direct, *and* discharge." *Hammerly Oaks, Inc. v. Edwards*, 959 S.W.2d at 391 (Emphasis supplied); *Fort Worth Elevators Co. v. Russell*, 70 S.W.2d at 406; *accord Magnolia Petroleum Co. v. Booth*, 105 S.W.2d 356, 358 (Tex. Civ. App.–Beaumont 1937, writ ref'd) (holding that Terry, who was a crew leader, was not a vice-principal because he had neither general supervisory power over the entire department nor the power to hire and fire anyone in his crew).

Next, combining this ability to simply tell the three individuals what to do with her permission to write or "sign off on" certain checks, to buy general office supplies, and to sign for deliveries is still insufficient. Their totality does not reasonably permit one to infer that Great Western confided the management of the whole business or a department or division thereof to her. This is so because nothing indicates that she had any general supervisory control over Great Western or any division or department thereof. Nothing indicates that she makes or has the power to make decisions about the daily operation of Great Western or any division or department thereof. Nothing illustrates that she can hire or fire anyone. And, to the extent that she can do certain things like tell some employees what to do, sign checks, and the like, nothing illustrates that she can do so autonomously or whether she must first receive direction from superiors.

9

What is not present in the record renders deficient that which is. Things exist in context. Out of context, evidence may suggest one thing while in context it may show something quite different. From what we are told here, Shellia may have some extensive management authority or the scope of her tasks may be no more than those of a clerk operating at the behest of her supervisors. From the sparse record before us, we can only guess at where in the spectrum she lies. So too must we conclude that one viewing the record in a light most favorable to the Garretts cannot reasonably infer that Great Western confided in her the management of either the whole business or a department or division of it. To paraphrase the Supreme Court in *Hammerly Oaks*, the "evidence on which [the Garretts] rel[y] is 'meager circumstantial evidence' which could give rise to any number of inferences, none more probable than another." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d at 392, *quoting Blount v. Borders, Inc.*, 910 S.W.2d 931 (Tex. 1995). It constitutes no evidence from which a reasonable factfinder can infer an ultimate fact, *id.*, and, therefore, the trial court did not err in granting summary judgment on the issue of vice-principal.

### Claim Three – Negligence

The last claim we address concerns Great Western's duty to supervise or control its employees.[2] According to the Garretts, they presented sufficient evidence on each element of the chose-in-action to avoid summary judgment. We disagree.

Texas does recognize a cause of action involving the negligent supervision of one's employees. Furthermore, successfully prosecuting it is not dependent upon a finding that

---

[2]Although the Garretts alleged a number of independent acts of negligence in their petition, the only one they brief on appeal is the failure of Great Western to supervise or control its employees.

the employee was acting within the course and scope of his employment. *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d at 496. This is so because the basis for responsibility lies in the master's own negligence in omitting to supervise an incompetent employee whom the master knows or should have known through the exercise of reasonable care was incompetent and thereby created an unreasonable risk of harm to others. *Peek v. Equipment Services, Inc.,* 906 S.W.2d 529, 534 (Tex. App.–San Antonio, 1995, no writ) (involving a claim of negligent hiring, retaining and supervision); *see also Dailey v. Albertson's, Inc.,* 83 S.W.3d 222, 227-28 (Tex. App.–El Paso 2002, no pet.) (absolving the employer of liability for negligence because no evidence illustrated that it knew or should have known of the employee's violent tendencies); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d at 500 (holding that a fact issue precluded summary judgment because there was some evidence that the employee was violent and engaged in violent acts while on duty, which conduct was known to at least one supervisor).

Here, there is evidence indicating that Shellia knew that fights could occur in a bar. So too does the record illustrate that at least two other individuals who were employed by Great Western had become embroiled in such a fight. The circumstances surrounding those brawls and when they occurred go undeveloped, however. Nevertheless, no evidence appears of record suggesting that Riley, Williams, or Dodson themselves exhibited violent or aggressive tendencies or engaged in fights at any time before the incident in question. Nor is there evidence of record suggesting that anyone at Great Western knew that any of the three had violent propensities before the bar incident. And, this was fatal for, as illustrated in *Peek*, *Dailey*, and *Wrenn*, the incompetency (or in this case, the propensity for violence) of the particular employee must or should have

11

reasonably been known by the employer.  Consequently, the trial court did not err in granting summary judgment on this issue either.

Accordingly, we overrule each issue of the Garretts and affirm the judgment of the trial court.


Brian Quinn
Justice